**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| MICHAEL ARNOLD, LINDA ARNOLD, | § | |
| *Plaintiffs,* | § | |
| | § | SA-21-CV-00438-XR |
| v. | § | |
| | § | |
| ALLIED VAN LINES, INC., JOHN DOES | § | |
| 1 AND 2, | § | |
| *Defendants.* | § | |

## ORDER

On this date, the Court considered Defendant's Motion for Partial Summary Judgment (ECF No. 28) and Defendant's Motion to Strike Plaintiffs' Expert Witnesses (ECF No. 29). After careful consideration, the Court issues the following order.

## BACKGROUND

Plaintiffs Michael and Linda Arnold (together, the "Arnolds") are husband and wife. ECF No. 30-1 at 2–8 ("M. Arnold Aff.") ¶ 1; ECF No. 30-1 at 67–73 ("L. Arnold Aff.") ¶ 1.[1] In 2020, they moved residences from Alabama to Texas. M. Arnold Aff. ¶ 1; L. Arnold Aff. ¶ 1. In preparation for their move, the Arnolds hired Defendant Allied Van Lines, Inc. ("Allied") to pack, store, and transport their household goods and personal property. M. Arnold Aff. ¶ 1; L. Arnold Aff. ¶ 1. On April 3, 2020, Mr. Arnold signed two forms that established an agreement with Allied for the interstate transportation of the Arnolds' items in exchange for payment.[2]

---

[1] When citing to the parties' filings, the Court refers to paragraph numbers and ECF pagination.

[2] Allied relies on three forms attached under Exhibit 1-A of its motion for summary judgment to show that, on August 28, 2020, the Arnolds entered into an agreement with Allied for the interstate transportation of their household goods and personal property. *See* ECF No. 28-1 at 5–7 ("Def.'s Mot. for Summ. J. Ex. 1-A"). These three forms consist of two pages entitled "Estimate & Order for Service" and a single page entitled "Addendum to Bill of Lading Customer's Declaration of Value," each of which Mr. Arnold purportedly signed on August 28, 2020. *See id.* According to Allied's custodian of records, these forms are true and correct copies of the original forms contained in Allied's files. *See* ECF No. 28-1 at 1–4 ("Bush Aff.") ¶¶ 4, 6, 11.

One of these forms is entitled "Bill of Lading-Customer's Declaration of Value." Pls.' Resp. to Mot. for Summ. J. Ex. 1-A. The Bill of Lading-Customer's Declaration of Value form offers two options for carrier liability: Standard Full Value Protection and Waiver of Full Replacement Value Protection. *Id.*

The Waiver of Full Replacement Value Protection option "provides only minimal protection that is considerably less than the average value of household goods." *Id.* "Under this option, a claim for any article that may be lost, destroyed, or damaged while in [Allied's] custody will be settled based on the weight of the individual article multiplied by 60 cents." *Id.*

The Bill of Lading-Customer's Declaration of Value form refers to the Standard Full Value Protection option as "Full (Replacement) Value Protection."[3] *Id.* "Full (Replacement) Value Protection is the most comprehensive plan available for protection[.]" *Id.* The terms and conditions under the Full (Replacement) Value Protection option provide:

> If any article is lost, destroyed, or damaged while in [Allied's] custody, [Allied] will, at its option, either: 1) repair the article to the extent necessary to restore it to the same condition as when it was received by [Allied], or pay you for the cost of such repairs; or 2) replace the article with an article of like kind and quality, or pay you

---

The Arnolds dispute the authenticity of these forms. They contend that these forms do not contain Mr. Arnold's authentic signature and that Allied forged Mr. Arnold's signature on these forms. M. Arnold Aff. ¶ 7; L. Arnold Aff. ¶ 7. To support their contentions, the Arnolds point to a hotel receipt, which, according to the Arnolds, shows that Mr. Arnold was in Tucson, Arizona from July 26, 2020 to August 29, 2020. ECF No. 30-1 at 36–38 ("Pls.' Resp. to Mot. for Summ. J. Ex. 1-G"). The Arnolds do not, however, contest that Mr. Arnold's authentic signature appears on a form entitled "Bill of Lading-Customer's Declaration of Value," which bears the date April 3, 2020. *See* M. Arnold Aff. ¶ 7; L. Arnold Aff. ¶ 7; *see also* ECF No. 30-1 at 10 ("Pls.' Resp. to Mot. for Summ. J. Ex. 1-A"). Thus, it is undisputed that the Arnolds reached an agreement with Allied on the interstate shipment of their items as early as April 3, 2020. Thus, the hotel receipt does not materially affect the Court's disposition of Allied's motion for summary judgment, and its objection to the same is therefore moot. *See* Def.'s Reply to Mot. for Summ. J. at 1 n.2.

[3] The terms and conditions under the Standard Full Value Protection option state, "The Cost Estimate that you receive from your mover MUST INCLUDE Full (Replacement) Value Protection for the articles that are included in your shipment." Pls.' Resp. to Mot. for Summ. J. Ex. 1-A. They further provide, "If you wish to waive the Full (Replacement) Level of protection, you must complete the WAIVER of Full (Replacement) Value Protection shown below." *Id.* If a customer wishes to accept Full (Replacement) Value Protection, the Bill of Lading-Customer's Declaration of Value form includes a designated space for the customer's signature. *See id.* Upon signing, the customer "acknowledge[s] that for my shipment I have: 1) ACCEPTED the Full (Replacement) Level of protection included in the estimate of charges[.]" *Id.* These terms and conditions make clear that Standard Full Value Protection and Full (Replacement) Value Protection are one and the same.

> for the cost of such a replacement. Under Full (Replacement) Value
> Protection, if you do not declare a higher replacement value on this
> form prior to the time of shipment, the <u>value of your goods will be</u>
> <u>deemed to be equal to $6.00 multiplied by the weight (in pounds) of</u>
> <u>the shipment, subject to a minimum valuation for the shipment of</u>
> <u>$6,000. Under this option, the cost of your move will be composed</u>
> <u>of a base rate plus an added cost reflecting the cost of providing this</u>
> <u>full value cargo liability protection for your shipment.</u>

*Id.* (emphasis in original) The option allows a customer to declare a higher value for their shipment.

*Id.* To do so, the customer must write the higher value in a designated space on the form. *Id.*

The Bill of Lading-Customer's Declaration of Value form also includes terms and conditions concerning articles of extraordinary value. *Id.* These terms and conditions provide:

> I acknowledge that I have prepared and retained a copy of the
> "Inventory of Items Valued in Excess of $100 Per Pound per
> Article" that are included in my shipment and that I have given a
> copy of this Inventory to [Allied's] representative. I also
> acknowledge that [Allied's] liability for loss of or damage to any
> article valued in excess of $100 per pound will be limited to $100
> per pound for each pound of such lost or damaged article(s) (based
> on actual article weight), not to exceed the declared value of the
> entire shipment, unless I have specifically identified such articles for
> which a claim for loss or damage may be made on the attached
> inventory.

*Id.*

The Arnolds chose the Full (Replacement) Value Protection option. *Id.* Mr. Arnold declared that the total value of the Arnolds' shipment was $150,000.[4] *Id.* He also signed a form

---

[4] Mr. Arnold's signature appears under the acknowledgement section for each option, suggesting that he both chose and waived Full (Replacement) Value Protection. *See* Pls.' Resp. to Mot. for Summ. J. Ex. 1-A. However, it is undisputed that Mr. Arnold executed the Bill of Lading-Customer's Declaration of Value form with the understanding that Allied's liability would be at least $150,000. Indeed, the Arnolds' second amended complaint is premised upon the allegation that Allied's liability is not limited to $150,000. *See* ECF No. 9 ("Pls.' Second Am. Compl.") ¶¶ 6–7, 9. They advance the same argument in their response to Allied's motion for summary judgment. *See* ECF No. 30 ("Pls.' Resp. to Mot. for Summ. J.") ¶¶ 6–7, 9, 17–18. The Arnolds' affidavits similarly contend that Allied's liability is not limited to $150,000 and that they chose the Full (Replacement) Value Protection option. *See* M. Arnold Aff. ¶¶ 2–3, 5, 9, 12; L. Arnold Aff. ¶¶ 2–3, 5, 9, 12. Further, their testimony at their respective depositions unequivocally establishes that the Arnolds elected the liability option that would cover at least $150,000. *See* ECF No. 34-1 ("M. Arnold Dep.") 60:1–60:23, 64:13–64:15; ECF No. 34-2 ("L. Arnold Dep.") 58:5–58:8. Finally, Mr. Arnold also signed a form entitled "Bill of Lading & Freight Bill," which clearly shows that the option he chose was "Full Value Replacement Amount: $150,000.00[.]" ECF No. 28-1 ("Def.'s Mot. for Summ. J. Ex. 1-C") at 76. The Arnolds do not dispute that Mr. Arnold's signature on the Bill of Lading & Freight Bill is authentic. *See* M. Arnold Aff. ¶ 7; L. Arnold

entitled "Bill of Lading & Freight Bill," which confirms that the option he chose was "Full Value Replacement Amount: $150,000.00[.]" Def.'s Mot. for Summ. J. Ex. 1-C at 76. The Bill of Lading & Freight Bill further shows that Mr. Arnold received and completed the Bill of Lading-Customer's Declaration of Value form. *Id.* It notes that the Arnolds' shipment was "[s]ubject to carrier applicable tariffs and all terms and conditions shown hereon." *Id.*

Mr. Arnold also signed a form entitled "High Value Inventory."[5] *See* ECF No. 30-1 at 12–15 ("Pls.' Resp. to Mot. for Summ. J. Ex. 1-B"). The High Value Inventory includes a statement of customer responsibilities:

> All items included in your shipment that are considered to be of extraordinary (unusual) value must be specifically identified and [Allied] must be advised that they are included in the shipment. Items of extraordinary value are defined as those items having a value greater than $100.00 per pound. Typical household items frequently having a value in excess of $100.00 per pound per article are: Antiques, China, Crystal, Figurines, Furs, Objects of Art, Oriental Rugs, Silverware, and Tapestries. Other items may also fall in this category and must be identified as well.

*Id.* The form's stated purpose is to assist the customer in identifying articles of extraordinary or unusual value, so that Allied is aware of those items that require special handling and protection. *Id.* The form cautions, "[F]ailure to identify such articles will result in limited carrier liability." *Id.*

The High Value Inventory also includes an important notice. *Id.* The language in the notice tracks the language concerning articles of extraordinary value in the Bill of Lading-Customer's Declaration of Value form. It reads:

> Owner (customer) agrees that any claim for loss or damage must be supported by proof of value and understands settlement will be

---

Aff. ¶ 7. In fact, Mr. Arnold testified that he signed the Bill of Lading & Freight Bill. M. Arnold Dep. 50:1–50:10. Therefore, there is no genuine dispute that the Arnolds elected the Full (Replacement) Value Protection, not the Waiver of Full Replacement Value Protection, option.

[5] The Arnolds do not contest the authenticity of Mr. Arnold's signature on the High Value Inventory. *See* M. Arnold Aff. ¶ 7; L. Arnold Aff. ¶ 7.

> subject to the declaration of the value contained on the accompanying Bill of Lading, the Bill of Lading terms and conditions, the Tariff in effect at the time of the shipment, the Household Goods Descriptive Inventory and all other pertinent information available to the carrier. If you have not listed articles having a value in excess of $100.00 per pound per article to this inventory, your signature below attests to the fact that such articles are not included in your shipment. Customer acknowledges that [Allied's] liability for loss or damage to any article not listed, that is valued in excess of $100.00 per pound will be limited to $100.00 per pound for each pound of such lost or damaged article (based on the actual article weight), not to exceed the declared value of the entire shipment, <u>unless</u> customer has specifically identified such articles for which a claim for loss or damage is made on this inventory.

*Id.* (emphasis in original). Mr. Arnold listed several items, as well as the condition and estimated value of each, on the High Value Inventory. *Id.*; *see also* M. Arnold Aff. ¶ 10; L. Arnold Aff. ¶ 10.

Allied packed the Arnolds' household goods and personal property from March 31, 2020 to April 3, 2020, and stored them until the beginning of September 2020, at which point Allied delivered the items to the Arnolds in Texas. M. Arnold Aff. ¶ 3; L. Arnold Aff. ¶ 3. Mr. Arnold accepted delivery of the items "subject to post inspection."[6] M. Arnold Dep. 51:13–51:20. The Arnolds "later discovered that a gun and jewelry [were missing] . . . and that a large number of [their] furniture and contents had been damaged . . . specifically 90 items were damaged." M. Arnold Aff. ¶ 3; L. Arnold Aff. ¶ 3. The damaged items consisted of several items Mr. Arnold had listed on the High Value Inventory. *See* M. Arnold Aff. ¶ 10; L. Arnold Aff. ¶ 10; *see also* Pls.' Resp. to Mot. for Summ. J. Ex. 1-B. The Arnolds submitted a claim to Allied for their missing and damaged items. M. Arnold Aff. ¶ 4; L. Arnold Aff. ¶ 4. To date, Allied has not compensated the Arnolds for any of their missing or damaged items. M. Arnold Aff. ¶ 6; L. Arnold Aff. ¶ 6.

---

[6] Allied includes as an exhibit to its motion for summary judgment an illegible form that Mr. Arnold apparently signed upon accepting the Arnolds' shipment in Texas. *See* Def.'s Mot. for Summ. J. Ex. 1-C at 78.

On April 13, 2021, the Arnolds filed suit in state court to recover damages. ECF No. 1-2 ("Pls.' Pet."). In their original petition, the Arnolds asserted state law claims against Allied and two of its agents. *Id.* On May 3, 2021, Allied and its agents removed the action to this Court on the basis of federal question jurisdiction. ECF No. 1 ("Defs.' Notice of Removal"). They argued that the Court has original, federal question jurisdiction over the Arnolds' claims because the Carmack Amendment preempts their state law claims. *Id.* ¶ 4.

On May 26, 2021, the parties filed a stipulation wherein the Arnolds "agreed to file an amended complaint in this case and assert claims against Defendant Allied Van Lines, Inc. under the Carmack Amendment and claims for conversion against individuals to be named as John Does 1 and 2."[7] ECF No. 6 ("Stip.") ¶ 3. In accordance with their stipulation, on July 13, 2021, the Arnolds filed their second amended complaint asserting a claim against Allied for violations of the Carmack Amendment and claims against John Does 1 and 2—two unknown Allied employees or agents who allegedly stole the Arnolds' gun and jewelry—for conversion.[8] Pls.' Second Am. Compl. ¶¶ 4, 12–15. They allege, *inter alia*, that Allied misrepresented its maximum liability and that Allied knew, at that time, that the Arnolds "possessed high end furniture and contents which were valued in excess of $150,000." *Id.* ¶ 6.

On December 22, 2021, the Arnolds filed their designation of expert witnesses pursuant to Federal Rule of Civil Procedure 26(a)(2). ECF No. 25 ("Pls.' Desig. of Experts"). The Arnolds designated themselves as expert witnesses and submit that they will testify on the following topics:

---

[7] The Arnolds also agreed to dismiss their claims against Allied's agents. Stip. ¶¶ 5–6.

[8] Allied does not contend that the Carmack Amendment preempts the Arnolds' claims for conversion against John Does 1 and 2. *But see Shamoun v. Old Dominion Freight Line, Inc.*, No. 3:19-CV-2034-G, 2020 WL 570903, at *6 (N.D. Tex. Feb. 4, 2020) ("And with respect to state law conversion claims, the Fifth Circuit has held that such claims are generally preempted by the Carmack Amendment, except where the party challenging preemption establishes that the 'carrier has intentionally converted for its own purposes the property of the shipper.'" (quoting *Trans Enters., LLC v. DHL Express (USA), Inc.*, 627 F.3d 1004, 1009 (5th Cir. 2010))).

> [T]heir contracting with Defendant Allied for the packing, moving, storage and delivery of their property as well as the representations made to them about coverage for damages to their property; the claims made for damages to their property; the property moved and stored, the damages to their property, the condition of their property before and after Allied took possession of such property; the value of the missing and damaged property and the scope and amount of damages they seek in this lawsuit.

*Id.* at 1–2. The Arnolds assert that their "opinions are based upon the inventories produced, the pictures they produced, the contract and correspondence produced and the estimate of Louis Shanks as well as their status as owners of the property at issue." *Id.* at 2.

The Arnolds also designated Jorge Fernandez as an expert witness. *Id.* Their designation states that they "hired" Mr. Fernandez. *Id.* It lists Mr. Fernandez's address and indicates that Mr. Fernandez is affiliated with Louis Shanks Furniture. *Id.* The entirety of Mr. Fernandez's designation reads as follows:

> Mr. Fernandez is a Property/furniture retailer assistant manager hired by Plaintiffs to inspect the damaged property and/or missing property and opine on the replacement cost and value of the property. He has knowledge regarding the condition of the property at issue in this case based on his inspection of the property and his experience, education and training in the value of furniture and the market value of furniture, and will testify regarding the damages at issue and the cost to repair and/or replace the damaged contents at issue as described in his report/estimate which has been produced.

*Id.* at 2–3.

On March 21, 2022, Allied filed a Motion for Partial Summary Judgment. ECF No. 28 ("Def.'s Mot. for Summ. J."). The Arnolds filed a response, Pls.' Resp. to Mot. for Summ. J., and Allied filed a reply, ECF No. 34 ("Def.'s Reply to Mot. for Summ. J.").

On March 22, 2022, Allied filed a Motion to Strike the Arnolds' expert witnesses. ECF No. 29 ("Def.'s Mot. to Strike"). The Arnolds filed a response, ECF No. 31 ("Pls.' Resp. to Mot. to Strike"), and Allied filed a reply, ECF No. 33 ("Def.'s Reply to Mot. to Strike").

## DISCUSSION

Allied seeks summary judgment on four discrete legal issues and moves to strike all of the expert witnesses the Arnolds have designated. *See* Def.'s Mot. for Summ. J.; Def.'s Mot. to Strike.

### I.   Allied's Motion for Partial Summary Judgment

#### A.   Legal Standard

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. FED. R. CIV. P. 56. "The moving party bears the initial burden of 'informing the [district court] of the basis of its motion' and identifying those portions of the record 'which it believes demonstrate the absence of a genuine issue of material fact.'" *Adams v. Travelers Indem. Co.*, 465 F.3d 156, 163 (5th Cir. 2006) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

To establish that there is no genuine issue of material fact, the movant must either submit evidence that negates the existence of some material element of the nonmovant's claims, or, if the crucial issue is one for which the nonmovant will bear the burden of proof at trial, point out that the evidence in the record is insufficient to support an essential element of the nonmovant's claims. *Little v. Liquid Air Corp.*, 952 F.2d 841, 847 (5th Cir. 1992), *on reh'g en banc*, 37 F.3d 1069 (5th Cir. 1994). Once the moving party meets its burden, the nonmoving party must "go beyond the pleadings" and designate specific facts in the record showing that there is a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 324. "[A] mere scintilla is not enough to defeat a motion for summary judgment." *Davis v. Chevron U.S.A., Inc.*, 14 F.3d 1082, 1086 (5th Cir. 1994).

To conclude that there are no genuine issues of material fact, the Court must be satisfied that no reasonable trier of fact could find for the nonmovant, or, in other words, that the evidence favoring the nonmovant is insufficient to enable a reasonable jury to return a verdict for the

nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, the Court gives "credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) (quotation marks and citation omitted).

The Court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Id.* at 150. However, "[u]nsubstantiated assertions . . . and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003).

### B. Analysis

Allied asks the Court to enter summary judgment in its favor on four discrete legal issues. *See* Def.'s Mot. for Summ. J. First, Allied submits that its liability, if any, is limited to $150,000. *Id.* at 9–17. Second, Allied argues that both Mr. and Mrs. Arnold are subject to the same liability limitation. *Id.* at 17–18. Third, Allied contends that, if it is found liable, it has the option to provide either repair or replacement value. *Id.* at 18–19. Fourth, Allied maintains that the Arnolds may not recover attorney's fees. *Id.* at 19–20.

### 1. Allied's liability, if any, is generally limited to $150,000, except for the items that Mr. Arnold listed on the High Value Inventory.

Allied contends that its liability, if any, under the Carmack Amendment for missing or damaged items is limited to $150,000. Def.'s Mot. for Summ. J. at 9–17.

"The Carmack Amendment allows a shipper to recover damages from a carrier for 'actual loss or injury to the property' resulting from the transportation of cargo in interstate commerce." *Nat'l Hisp. Circus, Inc. v. Rex Trucking, Inc.*, 414 F.3d 546, 549 (5th Cir. 2005) (quoting 49 U.S.C. § 14706(a)(1)). "Generally, the Carmack Amendment preempts state law claims arising out of the

9

shipment of goods by interstate carriers." *Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc.*, 738 F.3d 703, 706 (5th Cir. 2013).

To recover, "a shipper must establish a *prima facie* case of negligence by demonstrating: (1) delivery of the goods in good condition; (2) receipt by the consignee of less goods or damaged goods; and (3) the amount of damages." *Man Roland, Inc. v. Kreitz Motor Exp., Inc.*, 438 F.3d 476, 479 (5th Cir. 2006). "If the shipper establishes a *prima facie* case, there is a rebuttable presumption of negligence." *Distribuidora*, 738 F.3d at 706. "The carrier can overcome this presumption by showing that it was free from negligence *and* that the damage was due to the inherent nature of the goods or attributable to an act of God, public enemy, the shipper, or public authority." *Man Roland*, 438 F.3d at 479.

A carrier may contractually limit its liability to a shipper. The Fifth Circuit has adopted the *Hughes* test for establishing a carrier's right to limit its liability to a shipper under the Carmack Amendment. *Rohner Gehrig Co. v. Tri-State Motor Transit*, 950 F.2d 1079, 1081 (5th Cir. 1992) (citing *Hughes v. United Van Lines, Inc.*, 829 F.2d 1407, 1415 (7th Cir. 1987)). The *Hughes* test provides that the carrier may limit its liability to the shipper if it:

> (1) maintains a tariff within the prescribed guidelines of the Interstate Commerce Commission (now the Surface Transportation Board); (2) obtains the shipper's agreement as to her choice of liability; (3) gives the shipper a reasonable opportunity to choose between two or more levels of liability; and (4) issues a receipt or bill of lading prior to moving the shipment.

*Hoskins v. Bekins Van Lines*, 343 F.3d 769, 778 (5th Cir. 2003).

### i.  Allied maintained a valid tariff.

Allied has presented undisputed evidence that it maintains a tariff within the prescribed guidelines of the Surface Transportation Board. *See* Bush Aff. ¶ 9; *see also* ECF No. 28-1 at 8–75 ("Def.'s Mot. for Summ. J. Ex. 1-B"). The tariff makes clear that Allied's liability is limited:

> The maximum liability of Allied (or the party in possession) shall be either:
>
> > (1) The lump sum value declared by the shipper, which may not be less than $6,000 or $6.00 per pound multiplied by the actual weight of the shipment, in pounds, whichever is greater; or
> > (2) The actual loss or damage not exceeding 60 cents per pound of the weight of any lost or damaged article when the shipper has released the shipment to Allied, in writing, with liability limited to 60 cents per pound per article.
>
> Unless the shipper expressly releases the shipment to a value not exceeding 60 cents per pound per article, Allied's maximum liability for loss and damage shall be either the lump sum value declared by the shipper or an amount not less than $6.00 for each pound of weight in the shipment, whichever is greater.

Def.'s Mot. for Summ. J. Ex. 1-B at 63. Indeed, the limitations in Allied's tariff and the terms and conditions in the Bill of Lading-Customer's Declaration of Value form are essentially the same.

The first *Hughes* element is therefore satisfied.

### ii. Allied obtained the Arnolds' agreement as their choice of liability.

There is also no dispute that Allied obtained the Arnolds' agreement as to their choice of liability. Before Allied packed, stored, and moved the Arnolds' household goods and personal property, Allied presented Mr. Arnold with the Bill of Lading-Customer's Declaration of Value form. Pls.' Resp. to Mot. for Summ. J. Ex. 1-A. The form allowed Mr. Arnold to choose either Full (Replacement) Value Protection or Waiver of Full Replacement Value Protection. *Id.* The former, more comprehensive option stipulated that Allied's liability to the Arnolds "will be deemed to be equal to $6.00 multiplied by the weight (in pounds) of the shipment, subject to a minimum valuation for the shipment of $6,000." *Id.* (emphasis in original). However, the Full (Replacement) Value Protection option also gave the Arnolds the opportunity to declare a higher value for their shipment by writing the amount in a designated space on the form. *Id.* The Waiver

of Full Replacement Value Protection option, on the other hand, provided "only minimal protection that is considerably less than the average value of household goods." *Id.* "Under this option, a claim for any article that may be lost, destroyed, or damaged while in [Allied's] custody will be settled based on the weight of the individual article multiplied by 60 cents." *Id.*

The Arnolds chose the Full (Replacement) Value Protection option and declared that the value of their shipment was $150,000. *Id.* Mr. Arnold confirmed their choice by signing the Bill of Lading-Customer's Declaration of Value form. *Id.* He also confirmed their choice by signing the Bill of Lading & Freight Bill, which states that the Arnolds chose "Full Value Replacement Amount: $150,000.00[.]" Def.'s Mot. for Summ. J. Ex. 1-C at 76.

The second *Hughes* element is therefore satisfied.

### iii. Allied gave the Arnolds a reasonable opportunity to choose between two or more levels of liability.

The evidence in the record also establishes that Allied gave the Arnolds a reasonable opportunity to choose between two or more levels of liability.

"A shipper has a reasonable opportunity to choose among two levels of liability when she has 'both reasonable notice of the liability limitation and the opportunity to obtain information necessary to making a deliberate and well-informed choice.'" *Hoskins*, 343 F.3d at 779 (quoting *Hughes*, 829 F.2d at 1419). Mr. Arnold's authentic signature appears on the Bill of Lading-Customer's Declaration of Value form. In so signing, Mr. Arnold acknowledged that he accepted Full (Replacement) Value Protection and declared a higher total value of shipment. *See* Pls.' Resp. to Mot. for Summ. J. Ex. 1-A. Mr. Arnold reaffirmed his acceptance of this option and the declared higher value upon signing the Bill of Lading & Freight Bill. *See* Def.'s Mot. for Summ. J. Ex. 1-C at 76. Furthermore, Mr. Arnold testified at his deposition that he understood that Allied offered "different valuations lower than [$]150,000." M. Arnold Dep. 60:1–60:2. This evidence clearly

establishes that the Arnolds had a reasonable opportunity to choose between different levels of liability. They could have elected the Waiver of Full Replacement Value Protection option, but they instead chose the Full (Replacement) Value Protection option and declared a higher $150,000 value for the shipment.

It is true that Mr. Arnold also testified that Allied told him that $150,000 was the maximum declared value he could designate for the shipment. *Id.* 60:7–60:9. Mr. Arnold further testified that he accepted Allied's terms and conditions because new owners were soon taking possession of their property. *Id.* 64:3–64:12. Mrs. Arnold similarly testified at her deposition that she and her husband accepted Allied's offer of $150,000 liability under the Full (Replacement) Value Protection option "because that was all [Allied] had and we were in a time limit to move and get out of there for the people that wanted the house." L. Arnold Dep. 58:23–58:25.

But the mere fact that the Arnolds felt pressured to accept Allied's offer of $150,000 liability under the Full (Replacement) Value Protection option does not create a genuine dispute of material fact as to whether they had a reasonable opportunity to choose between two or more levels of liability. *See Johnson v. Bekins Van Lines Co.*, 808 F. Supp. 545, 549 (E.D. Tex. 1992) (finding that plaintiff had reasonable opportunity to choose between two or more levels of liability where she "admitted that she did not read the documents presented to her before signing them because she was in a hurry to pick up her paycheck and begin her move"). Rather, the undisputed evidence establishes that the Arnolds had reasonable notice of the $150,000 liability limitation. The evidence in the record also establishes that the Arnolds had sufficient opportunity to obtain any information that they needed to make a deliberate and well-informed choice.

The third *Hughes* element is therefore satisfied.

iv.     **Allied issued a bill of lading prior to moving the Arnolds' shipment.**

Finally, it is undisputed that Allied issued a bill of lading prior to moving the Arnolds' shipment. On April 3, 2020, months before the Arnolds' shipment arrived in Texas, Mr. Arnold signed the Bill of Lading-Customer's Declaration of Value form, the High Value Inventory, and the Bill of Lading & Freight Bill. *See* Pls.' Resp. to Mot. for Summ. J. Ex. 1-A; Pls.' Resp. to Mot. for Summ. J. Ex. 1-B; Def.'s Mot. for Summ. J. Ex. 1-C at 76. The Bill of Lading & Freight Bill contained a designated space for shipper and carrier signatures entitled "Delivery Confirmation." Def.'s Mot. for Summ. J. Ex. 1-C at 76. This space remained unsigned until the Arnolds received their shipment in September 2020. *Id.* at 77. Indeed, Mr. Arnold testified that he signed the Bill of Lading & Freight Bill when the Arnolds' shipment arrived in Texas.[9] M. Arnold Dep. 50:5–51:12; *see also* Def.'s Mot. for Summ. J. Ex. 1-C at 77.

The fourth and final *Hughes* element is therefore satisfied.[10]

v.     **A reasonable jury could find that the $150,000 liability limitation does not apply to the items Mr. Arnold listed on the High Value Inventory.**

The Arnolds argue that the terms and conditions they agreed to include those found in the High Value Inventory Mr. Arnold signed on April 3, 2020. *See* Pls.' Resp. to Mot. for Summ. J. ¶¶17–18. Specifically, they cite to the important notice in the High Value Inventory:

> Owner (customer) agrees that any claim for loss or damage must be supported by proof of value and understands settlement will be subject to the declaration of the value contained on the accompanying Bill of Lading, the Bill of Lading terms and conditions, the Tariff in effect at the time of the shipment, the Household Goods Descriptive Inventory and all other pertinent information available to the carrier. If you have not listed articles

---

[9] It appears that Mr. Arnold signed a second form upon accepting the shipment, but the form is, for the most part, illegible. *See* Def.'s Mot. for Summ. J. Ex. 1-C at 78.

[10] To be clear, in finding that the *Hughes* test is satisfied in this case, the Court does not rely on the forms that, according to the Arnolds, have been forged. The Court only relies on those forms bearing Mr. Arnold's undisputed authentic signature.

> having a value in excess of $100.00 per pound per article to this
> inventory, your signature below attests to the fact that such articles
> are not included in your shipment. Customer acknowledges that
> [Allied's] liability for loss or damage to any article not listed, that is
> valued in excess of $100.00 per pound will be limited to $100.00
> per pound for each pound of such lost or damaged article (based on
> the actual article weight), not to exceed the declared value of the
> entire shipment, <u>unless</u> customer has specifically identified such
> articles for which a claim for loss or damage is made on this
> inventory.

Pls.' Resp. to Mot. for Summ. J. Ex. 1-B (emphasis in original). The Arnolds emphasize the final sentence in the notice, which, they argue, establishes that Allied's "liability for the high-end items at issue in this lawsuit would not be limited to the declared value of the entire shipment for those items listed on the high end inventory." Pls.' Resp. to Mot. for Summ. J. ¶ 18.

"Federal courts apply federal common law where, as here, 'the rights of the litigants and the operative legal policies derive from a federal source.'" *Shamaley v. United States*, No. EP-17-CV-257-KC, 2018 WL 3800252, at *4 n.5 (W.D. Tex. May 11, 2018) (quoting *Fulgence v. J. Ray McDermott & Co.*, 662 F.2d 1207, 1209 (5th Cir. 1981); *see also Nat. Polymer Int'l Corp. v. FedEx Freight, Inc.*, No. 4:16-CV-00359, 2017 WL 3537324, at *3 (E.D. Tex. Aug. 17, 2017) ("A [bill of lading] is construed using contract principles." (citing *Mich. Cen. R.R. Co. v. Mark Owen & Co.*, 256 U.S. 427, 430 (1921))). "The federal law of contracts 'uses the core principles of the common law of contracts that are in force in most states.'" *Shamaley*, 2018 WL 3800252, at *4 n.5 (quoting *Smith v. United States*, 328 F.3d 760, 767 n.8 (5th Cir. 2003) (per curiam)). "These core principles can be derived from the Restatements." *Deville v. United States ex rel. Dep't of Veterans Affs.*, 202 F. App'x 761, 763 n.3 (5th Cir. 2006) (per curiam).

Under general contract principles, a "writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together." RESTATEMENT (SECOND) OF CONTS. §

202(2) (AM. L. INST. 1981). Whether one or more writings have been incorporated is a question of law. 11 WILLISTON ON CONTS. § 30:25 (4th ed.).

Here, the Bill of Lading-Customer's Declaration of Value form that Mr. Arnold signed on April 3, 2020, includes terms and conditions concerning items of extraordinary value. Pls.' Resp. to Mot. for Summ. J. Ex. 1-A. These terms and conditions provide:

> I acknowledge that I have prepared and retained a copy of the "Inventory of Items Valued in Excess of $100 Per Pound per Article" that are included in my shipment and that I have given a copy of this Inventory to [Allied's] representative. I also acknowledge that [Allied's] liability for loss of or damage to any article valued in excess of $100 per pound will be limited to $100 per pound for each pound of such lost or damaged article(s) (based on actual article weight), not to exceed the declared value of the entire shipment, *unless I have specifically identified such articles for which a claim for loss or damage may be made on the attached inventory.*

*Id.* (emphasis added). It is plain that the Bill of Lading-Customer's Declaration of Value form expressly incorporates the High Value Inventory that Mr. Arnold signed on the same day. The Court, therefore, construes the terms and conditions in the Bill of Lading-Customer's Declaration of Value form and High Value Inventory together.

Interpretation of the words in a contract is the first step towards the proper construction of a contract. WILLISTON § 30:1. The interpretation of a contract, including the determination of whether a contract is ambiguous, is a question of law. *Id.* § 30:5. A contract is ambiguous if it is reasonably susceptible to more than one meaning. *Id.* § 30:4.

Having carefully reviewed the terms and conditions in the Bill of Lading-Customer's Declaration of Value form and High Value Inventory, the Court finds that the notice in the High Value Inventory is reasonably susceptible to more than one meaning and is therefore ambiguous. The notice could be interpreted to mean, as the Arnolds submit, that the items Mr. Arnold listed

on the High Value Inventory are not subject to the $150,000 liability limitation. The last sentence in the notice provides:

> Customer acknowledges that [Allied's] liability for loss or damage to any article not listed, that is valued in excess of $100.00 per pound will be limited to $100.00 per pound for each pound of such lost or damaged article (based on the actual article weight), not to exceed the declared value of the entire shipment, <u>unless</u> customer has specifically identified such articles for which a claim for loss or damage is made on this inventory.

Pls.' Resp. to Mot. for Summ. J. Ex. 1-B (emphasis in original). The clause that begins with "<u>unless</u> customer" could be interpreted to establish an exception to the terms and conditions described in the preceding clauses. In other words, the language, "<u>unless</u> customer has specifically identified such articles for which a claim for loss or damage is made on this inventory," could be interpreted to mean that the items Mr. Arnold specifically identified on the High Value Inventory are not subject to the preceding terms and conditions in the same sentence, including the $150,000 liability limitation contemplated by the language, "not to exceed the declared value of the entire shipment."

Moreover, the terms and conditions in the Bill of Lading-Customer's Declaration of Value form itself could support the Arnolds' proposed interpretation. The form reads, in relevant part:

> I also acknowledge that [Allied's] liability for loss of or damage to any article valued in excess of $100 per pound will be limited to $100 per pound for each pound of such lost or damaged article(s) (based on actual article weight), not to exceed the declared value of the entire shipment, *unless I have specifically identified such articles for which a claim for loss or damage may be made on the attached inventory.*

Pls.' Resp. to Mot. for Summ. J. Ex. 1-A (emphasis added). The emphasized language could be interpreted to mean that Allied's liability, if any, may exceed the $150,000 higher value Mr. Arnold declared on the form if he "specifically identified such articles for which a claim for loss or damage

may be made on" the High Value Inventory. And it is undisputed that Mr. Arnold identified several household goods and personal property on the High Value Inventory.

Allied, nonetheless, maintains that the only reasonable interpretation of the notice is that a claim for loss or damage as to any item, including those listed on the High Value Inventory, is subject to the $150,000 liability limitation. Def.'s Reply to Mot. for Summ. J. at 4. Allied relies on the notice's introductory sentence for its proposed interpretation, which states:

> Owner (customer) agrees that any claim for loss or damage must be supported by proof of value and understands settlement will be subject to the declaration of the value contained on the accompanying Bill of Lading, the Bill of Lading terms and conditions, the Tariff in effect at the time of the shipment, the Household Goods Descriptive Inventory and all other pertinent information available to the carrier.

Pls.' Resp. to Mot. for Summ. J. Ex. 1-B. To be sure, the introductory sentence could be interpreted to apply to the entire notice. But it could also be interpreted to be a general condition that gives way to the more specific terms discussed at the end of the notice. Indeed, when interpreting a contract, "specific terms and exact terms are given greater weight than general language" and "separately negotiated or added terms are given greater weight than standardized terms or other terms not separately negotiated." RESTATEMENT (SECOND) OF CONTS. § 203(c)–(d). Moreover, "an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, lawful, or of no effect[.]"[11] *Id.* § 203(a).

Allied alternatively contends that the final sentence in the notice applies only to items that are not listed on the High Value Inventory. Def.'s Reply to Mot. for Summ. J. at 4. Its contention,

---

[11] The stated purpose of the High Value Inventory—to assist the customer in identifying articles of extraordinary or unusual value so that the carrier is aware of those items which require special handling and protection—may also suggest that the liability limitation applies with equal force to high-end items. Pls.' Resp. to Mot. for Summ. J. Ex. 1-B. But this observation only emphasizes that a genuine dispute of material fact as to the meaning of the notice in the High Value Inventory exists.

however, fails to account for the last clause in the final sentence of the notice that explicitly references "such articles for which a claim for loss or damage is made on this inventory." There is no dispute that the "inventory" this final clause references is the High Value Inventory Mr. Arnold signed on April 3, 2020. Thus, Allied's alternative argument is also unpersuasive.

The meaning of an ambiguous written contract is a question of fact. WILLISTON § 30:7. "The jury or other trier of fact, rather than the court as a matter of law, must interpret the contract's terms in light of the apparent purpose of the contract as a whole, the rules of contract construction, and relevant extrinsic evidence of the parties' intent and the meaning of the words that they used." *Id.* But where no relevant extrinsic evidence exists, the Court may resolve any ambiguity as a matter of law. *Id.* The Court may do the same if the relevant extrinsic evidence is undisputed. *Id.*

Disputed extrinsic evidence exists in this case. Mr. Arnold avers that Allied misrepresented its maximum liability for his and his wife's shipment. M. Arnold Aff. ¶ 2. He claims that Allied knew that he and his wife "possessed high-end furniture and contents which were valued in excess of $150,000.00, because [he] had completed Allied's form entitled 'High Value Inventory' which required [him] to list high value furniture and schedule a value for those items." *Id.*

Mr. Arnold also submits "that Allied agreed that any alleged maximum protection limit stated on the bill of lading . . . did not limit Allied's liability for 'high-end' items." *Id.* ¶ 9. He states that the Arnolds' shipment included "high-end furniture and contents which were valued in excess of $150,000, and we informed Allied of this fact." *Id.* Mr. Arnold further asserts that Allied "asked us to fill out Allied's form entitled 'High Value Inventory' which required us to list high value furniture and schedule a value for those items." *Id.* It was Mr. Arnold's understanding "that Allied agreed that its liability for the high-end items at issue in this lawsuit would not be limited

to the declared value of the entire shipment for those items listed on the high-end inventory." *Id.* ¶ 10. Mrs. Arnold's affidavit includes similar assertions.[12] *See* L. Arnold Aff. ¶¶ 2, 9, 10.

It is true that Mr. Arnold testified that Allied told him that its liability was limited to $150,000. M. Arnold Dep. 60:2–60:3, 60:9. Mrs. Arnold likewise testified that the liability Allied offered was limited to $150,000. L. Arnold Dep. 58:5–58:8, 58:23–58:25. But the Arnolds' affidavits simply supplement their testimony by clarifying the basis of their allegations and arguments. "When an affidavit merely supplements rather than contradicts prior deposition testimony, the court may consider the affidavit when evaluating genuine issues in a motion for summary judgment." *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 496 (5th Cir. 1996).

In their second amended complaint, the Arnolds allege, *inter alia*, that Allied misrepresented the amount of liability available to them and that Allied knew that they "possessed high end furniture and contents which were valued in excess of $150,000.00." Pls.' Second Am. Compl. ¶ 6. The assertions in their affidavits indicate that, when accepting Allied's services, the Arnolds understood that the $150,000 liability limitation, while generally applicable to their shipment, would not apply to the high-end items Mr. Arnold identified on the High Value Inventory based on the terms and conditions therein. As the Court discussed *supra*, the notice in the High Value Inventory is reasonably susceptible to the interpretation the Arnolds propose. And it is undisputed that some of the items that Mr. Arnold listed on the High Value Inventory were damaged. *See* M. Arnold Aff. ¶ 10; L. Arnold Aff. ¶ 10.

"The Carmack Amendment unambiguously imposes the risk of error on one particular party, the carrier, to the exclusion of the other party, this shipper." *FedEx*, 2017 WL 3537324, at

---

[12] Allied objects to paragraph two of Mrs. Arnold's affidavit on hearsay and confidentiality grounds. *See* Def.'s Reply to Mot. for Summ. J. at 1 n.2. It appears that Allied takes issue with those sentences in paragraph two that describe what Mr. Arnold and a mediator previously stated. The Court does not rely on these contested statements in reaching its decision. Allied's objection is therefore moot.

*5 (citing 49 U.S.C. § 14706(c)). What is more, at this stage of the proceedings, the Court draws all reasonable inferences in favor of the Arnolds and does not weigh the evidence or make credibility determinations. *Reeves*, 530 U.S. at 151. Drawing all reasonable inferences in favor of the Arnolds, the Court concludes that a reasonable jury could find that the Arnolds' proposed interpretation of the notice in the High Value Inventory is reasonable and that the items Mr. Arnold listed on the High Value Inventory, therefore, are not subject to the $150,000 liability limitation.

In sum, the Court finds that Allied has satisfied the *Hughes* test and has therefore established that, as a matter of law, its liability, if any, is generally limited to $150,000. However, Allied has not established as a matter of law that the $150,000 liability limitation applies to the items Mr. Arnold listed on the High Value Inventory. There is a genuine dispute of material fact as to the meaning of the notice in the High Value Inventory. A reasonable jury could find that the $150,000 liability limitation does not apply to any damaged items Mr. Arnold listed on the High Value Inventory. Alternatively, a reasonable jury could find that the high-end items are subject to the $150,000 liability limitation. A jury, not the Court, must make this determination.

### 2. The Arnolds are both subject to the same terms and conditions, including the general $150,000 liability limitation.

Allied argues that Mr. and Mrs. Arnold are both subject to the same liability limitation. *See* Def.'s Mot. for Summ. J. at 17–18. Having found that the $150,000 liability limitation need not necessarily apply to the items Mr. Arnold listed on the High Value Inventory, the Court construes Allied's argument as one that asks the Court to determine whether the Arnolds are both subject to the same terms and conditions, including the general $150,000 liability limitation.

Generally, "the formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration."[13] RESTATEMENT (SECOND) OF CONTS. § 17. Manifestation of mutual assent typically consists of an offer by one party followed by an acceptance by another party. *Id.* § 22(1). The signing of a proposed written agreement is generally sufficient to establish assent. WILLISTON § 6:44. Conduct may also convey an assent to a proposed agreement. RESTATEMENT (SECOND) OF CONTS. § 19 cmt. a. Specifically, a party's conduct may establish manifestation of her assent if she intends to engage in the conduct and knows or has reason to know that the other party may infer from her conduct that she assents. *Id.* § 19(2). Consideration is established where a performance or a return promise is bargained for. *Id.* § 71(1).

The undisputed evidence in this case shows that Mr. Arnold and Allied entered into a contract supported by a manifestation of mutual assent and consideration. Allied offered Mr. Arnold its shipping services with two options for liability. Mr. Arnold chose the Full (Replacement) Value Protection option and accepted the terms and conditions of Allied's offer upon signing several forms. Further, the Arnolds promised to pay Allied for its shipping services. A bargain supported by consideration and a manifestation of mutual assent therefore exists. Mr. Arnold, in turn, is subject to the contract's terms and conditions.

The same is true for Mrs. Arnold. Although her signature does not appear on the forms Mr. Arnold signed, there is no dispute that Mrs. Arnold knew that Allied's offer for shipping services was contingent upon one of two liability options. She testified that she was present when Mr.

---

[13] Allied's argument on this point rests on the proposition that, "[i]n cases like the present, where both a husband and a wife jointly sue a motor carrier to recover damages to their household goods, which the motor carrier transported interstate pursuant to a single bill of lading, one spouse's declaration regarding the total value of the shipment is binding on the other[.]" Def.'s Mot. for Summ. J. at 17. To support its assertion, Allied cites *Cleckner v. Republic Van & Storage Co., Inc.*, 556 F.2d 766 (5th Cir. 1977), and *Tayloe v. Kachina Moving & Storage, Inc.*, 16 F. Supp. 2d 1123, 1131 (D. Ariz. 1998). These cases, however, are inapposite. *Cleckner* applies Florida law and does not even mention the Carmack Amendment. *Tayloe*, meanwhile, summarily assumes, without analysis, that a husband's signature on a contract binds his wife. When considering whether one or more parties are subject to the same terms and conditions in a contract, the more appropriate inquiry is whether each party entered into the contract.

Arnold spoke with Allied's representatives and that she listened to their conversation. L. Arnold Dep. 34:25–35:5. Mrs. Arnold also testified that she and her husband both chose the Full (Replacement) Value Protection option and declared a higher shipment value of $150,000. *See id.* 58:5–58:25. In her affidavit, Mrs. Arnold similarly confirms that Allied marketed its services to both her and her husband and that they were both aware of the Full (Replacement) Value Protection option. L. Arnold Aff. ¶¶ 2, 12. Mrs. Arnold also acknowledges that she and her husband completed and submitted the High Value Inventory together. *Id.* ¶ 2.

Mr. Arnold, for his part, testified that his wife was present when Allied packed their belongings. *See* M. Arnold Dep. 64:22–64:24. He testified that he confirmed the shipment with Allied not only on behalf of himself, but also on behalf of his wife. *Id.* 53:3–53:5. In Mrs. Arnold's words, "Mike was really in charge of that, dealing with the contacts at certain points that he had to do - - deal with the paperwork, the documents, the cost, whatever." L. Arnold Dep. 34:21–34:24. The Arnolds, after all, were co-owners of the items they shipped with Allied. *See id.* 35:22–36:2; *see also* M. Arnold Dep. 52:14–16.

Based on this undisputed evidence, it is clear that Mrs. Arnold also entered into a contract supported by consideration and a manifestation of mutual assent. Mrs. Arnold was aware that Allied had offered its shipping services with two options for liability. She and her husband chose the Full (Replacement) Value Protection option. Mrs. Arnold intended to ship her belongings with Allied. She also had reason to know that shipping her items with Allied would cause Allied to infer that she assented to its offer and terms and conditions. Mrs. Arnold's conduct, therefore, establishes that she accepted Allied's offer. Thus, manifestation of mutual assent exists. The Arnolds' bargained-for promise to pay Allied in exchange for its services provides the requisite consideration. Mrs. Arnold is accordingly subject to the same terms and conditions in the contract.

As a result, the Court finds that, as a matter of law, both Mr. and Mrs. Arnold are subject to the same terms and conditions, including the general $150,000 liability limitation.[14]

### 3.  If found liable, Allied has the option to provide repair or replacement value.

Allied argues that if it is found liable, it has the option to provide either repair or replacement value. *See* Def.'s Mot. for Summ. J. at 18–19.

Under the Carmack Amendment, a carrier is liable for the "actual loss or injury to the property[.]" 49 U.S.C. § 14706(a)(1). "[T]he ordinary measure of damages in cases of this sort is the difference between the market value of the property in the condition in which it should have arrived at the place of destination and its market value in the condition in which, by reason of the fault of the carrier, it did arrive." *Gulf, C. & S.F. Ry. Co. v. Tex. Packing Co.*, 244 U.S. 31, 37 (1917). According to the First Circuit, damages recovered pursuant to the Carmack Amendment are "ordinarily measured either by the reduction in market value caused by the defendant or by replacement or repair costs occasioned by the harm." *Fredette v. Allied Van Lines, Inc.*, 66 F.3d 369, 372 (1995) (citing *Oak Hall Cap & Gown Co., Inc. v. Old Dominion Freight Line, Inc.*, 889 F.2d 291, 296 (4th Cir. 1990)). The Fifth Circuit has similarly determined that the Carmack Amendment "incorporates common law principles for damages." *Hector Martinez & Co. v. S. Pac. Transp. Co.*, 606 F.2d 106, 108 (5th Cir. 1979). Thus, despite the Arnolds' argument to the contrary, the Carmack Amendment allows, absent contractual language indicating otherwise, a carrier to choose repair value as the measure of damages if a repair will remedy the actual loss.

---

[14] The Arnolds' counterarguments focus on the absence of Mrs. Arnold's signature on certain forms. *See* Pls.' Resp. to Mot. for Summ. J. ¶¶ 23–24. They argue that this absence establishes that the *Hughes* test is not satisfied and that, as a result, the general $150,000 liability limitation is not valid. *See id.* But the relevant issue is whether Mrs. Arnold entered into a contract with Allied that bound her to its terms and conditions, not whether Mrs. Arnold signed certain documents. Thus, the Arnolds' counterarguments are misplaced.

The Arnolds chose Full (Replacement) Value Protection. This option provides:

> If any article is lost, destroyed, or damaged while in [Allied's] custody, [Allied] will, *at its option*, either: 1) *repair* the article to the extent necessary to restore it to the same condition as when it was received by [Allied], or pay you for the cost of such repairs; or 2) *replace* the article with an article of like kind and quality, or pay you for the cost of such a replacement.

Pls.' Resp. to Mot. for Summ. J. Ex. 1-A (emphasis added). It is plain that Allied has the option to repair, replace, or pay the Arnolds for the cost of such replacements. *See* RESTATEMENT (SECOND) OF CONTS. § 202(3)(a) (stating that, where language in a contract "has a generally prevailing meaning, it is interpreted in accordance with that meaning"); *see also Green v. Biddle*, 21 U.S. 1, 89–90 (1823) ("[W]here the words of a . . . contract, have a plain and obvious meaning, all construction, in hostility with such meaning, is excluded.").

Still, the Arnolds maintain that replacement value is the only possible remedy because Mr. Arnold "was told that [he] could elect between 'full value protection' which was supposed to be 'full replacement cost' for any lost or damaged furniture and he selected 'full value protection.'" M. Arnold Aff. ¶ 12. The plain language in the Bill of Lading-Customer's Declaration of Value form, however, belies Mr. Arnold's assertion in his affidavit to the contrary. Unlike the assertions in his affidavit tending to support the Arnolds' proposed interpretation of the notice in the Bill of Lading-Customer's Declaration of Value form, Mr. Arnold's singular statement that he believed that the Full (Replacement) Value Protection option circumscribed Allied's remedial options to include replacement value only contradicts the plain language in the form and is unsupported by any other evidence in the record. *See Powell v. Dall. Morning News L.P.*, 776 F. Supp. 2d 240, 247 (N.D. Tex. 2011) ("Under the 'sham affidavit' doctrine, a 'nonmovant cannot defeat a motion for summary judgment by submitting an affidavit which directly contradicts, without explanation, his previous testimony.'" (quoting *Albertson v. T.J. Stevenson & Co., Inc.*, 749 F.2d 223, 228 (5th

Cir. 1984))). Mr. Arnold's mere assertion to the contrary in his affidavit, therefore, is insufficient to create a genuine dispute of material fact as to whether Allied, if found liable, has the option to choose repair or replacement value.

Thus, the Court finds that, as a matter of law, Allied, if found liable, has the option to choose either repair or replacement value.[15]

### 4. The Arnolds may recover attorney's fees authorized by federal law.

Finally, Allied asks the Court to find that, as a matter of law, the Arnolds may not recover attorney's fees. *See* Def.'s Mot. for Summ. J. at 19–20.

"[A]ttorney's fees authorized by state law are not available in Carmack Amendment actions." *Accura Sys., Inc. v. Watkins Motor Lines, Inc.*, 98 F.3d 874, 876 (5th Cir. 1996). However, attorney's fees authorized by federal law are available in Carmack Amendment actions, provided that certain conditions are satisfied. *See* 49 U.S.C. § 14708(d); *see also Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 383 n.4 (5th Cir. 1998) (finding that district court erred in dismissing plaintiff's claim for attorney's fees in Carmack Amendment action in light of 49 U.S.C. § 14708(d)). Allied, therefore, is incorrect in contending that the Arnolds may not, as a matter of law, recover attorney's fees in this Carmack Amendment action.

The Court is not persuaded by Allied's argument that the parties' stipulation prevents the Arnolds from claiming attorney's fees. *See* Def.'s Reply to Mot. for Summ. J. at 5. The stipulation the parties entered into states that the Arnolds agreed to "assert claims against Defendant Allied Van Lines, Inc. under the Carmack Amendment[.]" Stip. ¶ 3. The Arnolds' claim for attorney's fees under 49 U.S.C. § 14708(d) is a claim under the Carmack Amendment. *See Unaegbu v. Am.*

---

[15] The Court's finding extends to the items Mr. Arnold listed in the High Value Inventory, as the Bill of Lading-Customer's Declaration of Value form makes clear that the Full (Replacement) Value Protection option applies "[i]f *any* article is lost, destroyed, or damaged[.]" Pls.' Resp. to Mot. for Summ. J. Ex. 1-A (emphasis added).

*Knights Moving & Storage*, No. W:14-CV-074, 2014 WL 12539734, at *3 (W.D. Tex. Oct. 16, 2014) (stating that 49 U.S.C. § 14708(d) is a subsection of the Carmack Amendment).

As a result, the Court finds that the Arnolds may recover attorney's fees authorized by federal law, if they satisfy the requirements listed under 49 U.S.C. § 14708(d).

## II.   Allied's Motion to Strike

### A.   Legal Standard

A witness "who is qualified as an expert by knowledge, skill, experience, training, or education may testify" if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

The Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), provides the analytical framework for determining the admissibility of expert opinion testimony. The Court acts as a "gatekeeper" to ensure that expert opinion testimony meets the standards set forth in Federal Rule of Evidence 702. *Id*. at 589. As a preliminary matter, the Court "must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'" *United States v. Cooks*, 589 F.3d 173, 179 (5th Cir. 2009) (quoting FED. R. EVID. 702). If the expert is qualified, the Court must ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. The proponent of expert opinion testimony must prove by a preponderance of the

evidence that the expert is qualified, that the testimony is relevant to an issue in the case, and that the proffered expert opinion testimony is reliable. *Id.* at 590–93.

Further, "a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702[.]" FED. R. CIV. P. 26(a)(2)(A). This includes disclosure of any expert witness, along with a written report prepared and signed by the witness, "if the witness is one retained or specially employed to provide expert testimony[.]" FED. R. CIV. P. 26(a)(2)(B). The written report must contain:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
> (ii) the facts or data considered by the witness in forming them;
> (iii) any exhibits that will be used to summarize or support them;
> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
> (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
> (vi) a statement of the compensation to be paid for the study and testimony in the case.

*Id.*

If the party fails to properly disclose an expert witness, they are "not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1). To assess whether the party's violation is harmless, the Court considers four factors: "(1) the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose." *Tex. A&M Rsch. Found. v. Magna Transp., Inc.*, 338 F.3d 394, 402 (5th Cir. 2003).

### B. Analysis

Allied moves to strike the Arnolds' designation of themselves and Jorge Fernandez as expert witnesses. *See* Def.'s Mot. to Strike. It contends that the Arnolds' testimony does not qualify

as expert opinion testimony and that their status as owners does not automatically qualify them as experts. *Id.* at 2–5. Allied further argues that the Court should strike Mr. Fernandez as an expert witness because the Arnolds failed to include a written report that complies with Federal Rule of Civil Procedure 26(a)(2)(B) upon disclosing Mr. Fernandez as an expert witness. *Id.* at 5–7.

1. **The Arnolds may, subject to the Federal Rules of Evidence, offer lay opinion testimony only.**

Allied asserts that the Arnolds are not qualified to offer expert opinion testimony on the events that gave rise to this case because such testimony is not based on scientific, technical, or other specialized knowledge. Def.'s Mot. to Strike at 3–4. It argues that the Arnolds' testimony on the historical facts underlying this action is more properly admitted as lay, not expert, opinion testimony. *Id.* at 4. Allied also contends that the Arnolds are not qualified to give expert opinion testimony on the value of their missing and damaged items simply because they are the owners of these items. *Id.* at 4–5. Lay opinion testimony, Allied submits, is also the proper vehicle for testimony concerning the value of the Arnolds' missing and damaged items. *Id.*

Federal Rule of Evidence 702 "clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify." *Daubert*, 509 U.S. at 589. The rule not only requires that the expert be qualified "by knowledge, skill, experience, training, or education[,]" but also demands that "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue[.]" Fed. R. Evid. 702. Thus, "the Court must examine whether the expert will testify to scientific or technical knowledge that will assist the trier of fact to understand or determine a fact in issue." *Smith v. Borden, Inc.*, 188 F.R.D. 257, 259 (E.D. La. 1999).

"Whether opinion testimony rests on scientific, technical, or other specialized knowledge turns on 'whether the testimony falls within the realm of knowledge of the average lay person.'"

*Consol. Env't Mgmt., Inc.--Nucor Steel La. v. Zen-Noh Grain Corp.*, 981 F. Supp. 2d 523, 533 (E.D. La. 2013) (quoting *United States v. Caldwell*, 586 F.3d 338, 348 (5th Cir. 2009)). "[T]he admission or exclusion of expert testimony is a matter within the sound judicial discretion of the trial judge." *Stancill v. McKenzie Tank Lines, Inc.*, 497 F.2d 529, 535 (5th Cir. 1974).

In their designation of expert witnesses, the Arnolds state that they intend to offer expert opinion testimony on eight topics. These include:

> [1] [T]heir contracting with Defendant Allied for the packing, moving, storage and delivery of their property [2] as well as the representations made to them about coverage for damages to their property; [3] the claims made for damages to their property; [4] the property moved and stored, [5] the damages to their property, [6] the condition of their property before and after Allied took possession of such property; [7] the value of the missing and damaged property and [8] the scope and amount of damages they seek in this lawsuit.

Pls.' Desig. of Experts at 1–2. In response to Allied's motion to strike, the Arnolds clarified that their "expert designation contained a typographical error[.]" Pls.' Resp. to Mot. to Strike ¶ 6. They assert, "Plaintiffs are not considered experts on contracts or shipping and do not intend to offer any opinions on those issues." *Id.* Thus, the only topics that the Arnolds seek to offer expert opinion testimony on are (1) the representations that Allied made to them about its liability before the shipment; (2) the claims that the Arnolds submitted to Allied for their missing and damaged items; (3) the nature of the items Allied shipped; (4) the nature of the damages certain items sustained; (5) the condition of the shipped items before shipment; (6) the value of their missing and damaged items; and (7) the scope and amount of damages they allege in this action.

While testimony on topics one through seven may help a jury understand the evidence or determine a fact issue, such testimony does not require scientific, technical, or other specialized knowledge. Rather, these topics merely implicate the Arnolds' first-hand knowledge of historical, perceived events. Testimony regarding first-hand, historical perceptions constitutes lay, not expert,

opinion testimony. Indeed, Federal Rule of Evidence 701 provides that a witness may offer opinion testimony if it is rationally based on their perception, helpful to clearly understanding their testimony or determining a fact in issue, and not based on scientific, technical, or other specialized knowledge within the scope of Federal Rule of Evidence 702. *See* FED. R. EVID. 701; *see also United States v. Carrillo-Morones*, 564 F. Supp. 2d 707, 712 (W.D. Tex. 2008) ("However, testimony regarding an officer's perceptions of a particular event and whether or not such perceptions are consistent with his or her prior experiences constitutes lay opinion testimony.").

Therefore, the Arnolds may offer lay, not expert, opinion testimony on topics one through seven, subject to the Federal Rules of Evidence.

### 2. The Arnolds' failure to comply with Federal Rule of Civil Procedure 26(a)(2)(B) upon disclosing Jorge Fernandez as an expert witness is harmless.

Allied also asks the Court to strike Jorge Fernandez as an expert witness because the Arnolds failed to produce a written expert report that complies with Federal of Civil Procedure 26(a)(2)(B) upon disclosing Mr. Fernandez as an expert witness. Def.'s Mot. to Strike at 5–7.

The Arnolds designated Mr. Fernandez as a "hired" expert witness. Pls.' Desig. of Experts at 2. As a result, the Arnolds were required to produce a written report prepared and signed by Mr. Fernandez. *See* FED. R. CIV. P. 26(a)(2)(B). Mr. Fernandez's written report needed to contain the six assertions Federal Rule of Civil Procedure 26(a)(2)(B) requires. *See id.*

The Arnolds, however, failed to produce any written report upon disclosing Mr. Fernandez as an expert witness. They instead refer to a "report/estimate" that Mr. Fernandez prepared and was apparently produced during discovery. *See* Pls.' Desig. of Experts at 2–3. To the extent that the Arnolds argue that this "report/estimate" is the written report Federal Rule of Civil Procedure 26(a)(2)(B) requires, their argument is unpersuasive.

Mr. Fernandez's "report/estimate" merely contains a list of thirty-nine household items, with descriptions of where in the house these items were located, the damage these items sustained, and their replacement cost. *See* ECF No. 29-1 ("Def.'s Mot to Strike Ex. A"). It fails to include a complete statement of all opinions Mr. Fernandez will express and the basis and reasons for them; a clear statement of the facts or data Mr. Fernandez considered in forming his opinions; any exhibits that Mr. Fernandez will use to summarize or support his opinions; Mr. Fernandez's qualifications and a list of publications that he authored in the past ten years, if any; a list of cases from the past four years in which Mr. Fernandez testified as an expert at trial or by deposition, if any; and a statement of the compensation Mr. Fernandez will receive for testifying in this case. *See id.* In short, the "report/estimate" fails to provide any of the information that Federal Rule of Civil Procedure 26(a)(2)(B) requires. The Arnolds, therefore, have failed to comply with the rule.

Although the Arnolds do not argue that their failure to comply was substantially justified or is harmless, *see* FED. R. CIV. P. 37(c)(1), the Court considers the issue *sua sponte. See Mission Toxicology, LLC v. UnitedHealthcare Ins. Co.*, 499 F. Supp. 3d 338, 343 (W.D. Tex. 2020) ("Whether to exclude evidence under Rule 37(c)(1) lies within the Court's sound discretion." (citing *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 563 (5th Cir. 2004))).

The Arnolds submit that Allied knew "that Mr. Fernandez visually inspected the furniture, took many photos and such were sent to Allied before the lawsuit was filed." Pls.' Resp. to Mot. to Strike ¶ 7. They maintain that Allied was already in receipt of Mr. Fernandez's estimate, "along with lists created by Mr. and Mrs. Arnold for replacement of the other damaged items[.]" *Id.* The Arnolds have also clarified that "Mr. Fernandez has never testified[.]" *Id.* The Arnolds' failure was not intentional, and the Court, therefore, finds that their explanation is sufficient in this case.[16]

---

[16] In so finding, the Court cautions the Arnolds and their counsel that they must fully comply with all federal and local rules moving forward.

Further, Mr. Fernandez's testimony on the scope and amount of damages is important because the scope and amount of damages is a central point of contention between the parties.[17]

Finally, Allied submits that the Arnolds' failure to produce a written report prevented it from obtaining "information on which it could base a *Daubert* motion or other challenge." Def.'s Reply to Mot. to Strike at 4. The Court will order the Arnolds to produce a written report prepared and signed by Mr. Fernandez that fully complies with Federal Rule of Civil Procedure 26(a)(2)(B). The Court will then allow Allied to file, if it can do so in good faith, a *Daubert* motion as to Mr. Fernandez's proffered expert opinion testimony. Allied's asserted prejudice is therefore cured. The Court will issue an amended scheduling order with deadlines for these matters.

## CONCLUSION

Accordingly, Defendant's Motion for Partial Summary Judgment (ECF No. 28) is hereby **GRANTED IN PART** and **DENIED IN PART**. Defendant's Motion to Strike Plaintiffs' Expert Witnesses (ECF No. 29) is hereby **GRANTED IN PART** and **DENIED IN PART**.

It is so **ORDERED**.

**SIGNED** this July 1, 2022.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE

---

[17] Although the Arnolds' designation of experts states that Mr. Fernandez "will testify regarding the damages at issue and the cost to repair and/or replace the damaged contents at issue as described in his report/estimate[,]" Pls.' Desig. of Experts at 2–3, Mr. Fernandez's "report/estimate" appears to address replacement value only, *see* Def.'s Mot. to Strike Ex. A. The Court, at this time, expresses no opinion on the propriety of Mr. Fernandez offering expert opinion testimony on repair value.